IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITHDIVISION

WENDY D. ROYCE                                                    PLAINTIFF

v.                                              CIVIL NO. 18-2032

NANCY A. BERRYHILL, Commissioner                        DEFENDANT
Social Security Administration

## MAGISTRATE JUDGE'S REPORT AND RECCOMENDATIONS

Plaintiff, Wendy D. Royce, brings this action pursuant to 42 U.S.C. §405(g), seeking judicial review of a decision of the commissioner of the Social Security Administration (Commissioner) denying her claims for a period of disability and disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See U.S.C. § 405(g).

## I.      Procedural Background:

Plaintiff protectively filed her current application for DIB on June 8, 2015, alleging an inability to work since February 1, 2012, due to bipolar disorder, anxiety, post-traumatic stress disorder, depression, and back pain. (Tr. 15, 304). An administrative hearing was held on May 10, 2016. (Tr. 52-80). At the hearing, the ALJ ordered that the record be left open for thirty days to allow Plaintiff to submit updated medical records regarding bladder issues that were discussed in the hearing. (Tr. 75). The ALJ also sent Plaintiff to a consultative examination

1

following the hearing and Plaintiff requested a supplemental hearing. (Tr. 15). A supplemental hearing was held on February 22, 2017. (Tr. 38, 51).

By written decision dated May 19, 2017, the ALJ that Plaintiff had an impairment or combination of impairments that were severe. (Tr. 18). Specifically, the ALJ found that Plaintiff had the following severe impairments: unspecified mood disorder, and dependent personality traits. (Tr. 18). The ALJ found Plaintiff had the following non-severe impairments: migraines caused by a Chiari malformation, diabetes, carpal tunnel syndrome in the right arm, sensory neuropathy of the upper extremities, and ulnar motor neuropathy on the right, obstructive sleep apnea, incontinence, chronic back, neck and hip pain, and foot pain. (Tr. 18-19). However, after reviewing all evidence presented, the ALJ determined that through the date last insured, Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 160-161). The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform work where interpersonal contact is incidental to the work performed, e.g. assembly work; where the complexity of tasks is learned and performed by rote, with few variables and little judgment; and where the supervision required is simple, direct, and concrete.

(Tr. 21). With the help of a vocational expert, the ALJ determined that Plaintiff could not perform any of her past relevant work. (Tr. 26). However, the ALJ found Plaintiff could perform the duties of the representative occupations of hand packager, marking clerk, and document preparation clerk. (Tr. 27).

On May 24, 2017, Plaintiff requested a review of the hearing decision by the Appeals Council. (Tr. 1, 247). The Appeals Council denied Plaintiff's request for review. (Tr. 1-4).

Subsequently, Plaintiff filed this action. (Doc. 1). The parties have filed appeal briefs and this case is before the undersigned for report and recommendation. (Docs. 16, 17). The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

## II.    Evidence Presented:

At the initial hearing held May 10, 2016, Plaintiff was represented by Michael Hamby. (Tr. 54).  Plaintiff testified that she had recently turned forty, had a high school diploma, and was working as a substitute teacher for two days per week.  (Tr. 55).  She testified that the school asked she only work two days a week because of her bladder issues. (Tr. 55-56). Plaintiff testified she had been working as a substitute teacher since 2014 and used to work full time but, as her health declined, she had begun to work less.  (Tr. 56).  Plaintiff testified that she worked as a cashier in the Starbuck's Department at Target in 2013, but that she lost that job after she yelled at a manager when he asked her to do something when she was already too busy. Id. Plaintiff testified that she had worked at North Arkansas Regional Medical as a physical therapy tech.  (Tr. 56-57). Plaintiff testified that she helped patients with rehab, which included lifting patients, bathing them, walking them, and exercising them and required her to be on her feet for between eight and fourteen hours per day. (Tr. 58). Plaintiff testified that she lost that job due to her bipolar and anxiety, specifically when some changes were going on she would yell at patients and also yelled at her boss, which led to her termination. (Tr. 58).

Plaintiff testified that she had migraine headaches two to three times a week and some of them are severe enough that she would lie in bed with the curtains shut and want to be left

alone. (Tr. 59). Plaintiff testified that sometimes her migraine medication could make them go away in two to three hours, but the week prior to the hearing, she had one for four days straight that kept her from sleeping. (Tr. 63). Plaintiff testified that she had a Chiari malformation and because of that her neck hurt ninety-five percent of the time, and it also caused numbness in her right arm and hand to the point that at times she could not hold even a pen. Id. Plaintiff testified that her right-hand numbness occurred multiple times per day and that sometimes her left arm felt like it was just dead weight. (Tr. 63-64). Plaintiff testified she had also been told that her back pain and right hip pain was a symptom of her Chiari's malformation. Id.

Plaintiff testified she had surgery on her right ankle in 2002 or 2003, that she could not walk on it or it would swell at night and could only stand for fifteen or twenty minutes at a time. Id. Plaintiff testified she also had anxiety and bipolar and both were exacerbated by her pain. Id. Plaintiff testified that, due to her Chiari malformation, Nurse Janice Bishop had put her under a lifting restriction of no more than five pounds. (Tr. 60). Plaintiff testified that she had a bladder suspension in 2014 and her frequent need to use the restroom had progressively worsened since then, giving as examples that, while waiting for 45 minutes for her hearing, she had used the bathroom twice and that she had to start taking a change of clothes to school in preparation for the possibility of incontinence. Id.

Plaintiff testified she was also diagnosed with asthma, which she took daily medication for, and could not be around fumes, smells, heat or cold because of asthma attacks and pneumonia. (Tr. 62). Plaintiff testified she had pneumonia three times in the last two winters. (Tr. 62). Plaintiff testified that her bipolar disorder would flare up regularly and that she was being treated by Perspectives and, before that, had been treated at a clinic in Harrison. (Tr. 62-63). Plaintiff testified that despite taking Lithium, Prozac and Zyprexa, and her treatment

providers trying to find more effective dosing, she was still symptomatic. (Tr. 66-67). Plaintiff testified that these medications had no side effects, but that sometimes due to her anxiety she would get heartburn that felt like chest pain. (Tr. 67). She would also throw up due to anxiety, so she was prescribed Ranitidine to keep her stomach settled. (Tr. 67). Plaintiff testified that she was also prescribed Ambien by Perspectives, and that she expected it would be changed when she went in at the end of the month because she was still having problems with her mind racing and keeping her awake, or seeing things crawling across the floor or wall. (Tr. 68). At times she had heard voices, but she was not hearing them as often as she used to. (Tr. 68). Plaintiff testified that she had diabetes and had recently started taking Metformin and watching what she ate to try and control her blood sugar. (Tr. 69). Plaintiff also reported taking Cyclobenzaprine, a muscle relaxer, for her neck, back, and hip. (Tr. 69). Plaintiff testified that her muscle relaxer and her bladder control medications had warnings against operating heavy machinery or being around heights or hazards. (Tr. 71-72).

Plaintiff testified that she could sweep, but if she wanted to sweep her kitchen, it would take three hours because she would have to sit down and rest often and that vacuuming was difficult for the same reasons. (Tr. 70). She testified that she could not mop or clean toilets because it was too hard to bend over, and that she did not have the strength to wring out the mop. (Tr. 70). Plaintiff testified that she did help make her bed or flip the cushions in the couch and some things like that. (Tr. 70). Plaintiff testified that she was able to drive but very little because of her anxiety, stating that she had a bad panic attack and nearly had a wreck, so she might drive to her son's school, which was about five miles away or to work at a school. (Tr. 70). However, Plaintiff testified that in the afternoon, sometimes she would wait until all the traffic had left the school before she would leave. Id.

5

Plaintiff's mother, Ann Thomson, also testified. (Tr. 76). Ms. Thomson testified that she talked to Plaintiff every other day and saw her at least ten days per month, and that she had noticed a change in her over the past few years. (Tr. 76). She testified that Plaintiff would get upset easily if she got tired or something did not go her way; that she got headaches causing her to stay underneath the covers; and that she had back and leg pain, and pain from where she had surgery on her ankle, as well as something wrong with the back of her neck. (Tr. 76-77). Ms. Thomson testified that Plaintiff's headaches happened roughly every five days. (Tr. 79). Ms. Thomson testified that when she saw Plaintiff in person, usually she would drive to her daughter unless Plaintiff's boyfriend could drive her, as she did not feel comfortable letting Plaintiff drive her car and Plaintiff did not have her own car. (Tr. 77). Ms. Thomson testified she would not allow Plaintiff to drive her car because if someone got in front of her or was closing in, Plaintiff would get upset and cut in front of that car and, although Plaintiff had never had a wreck, Ms. Thomson did not want Plaintiff driving her car or with Ms. Thomson's grandchildren or great-granddaughter in the car. (Tr. 78). Ms. Thomson testified that when Plaintiff got upset she would kick the furniture, slam a door, break a window, or leave for an hour or two. (Tr. 78). Ms. Thomson testified that these episodes happened every three or four days a week and sometimes more often if Plaintiff was upset, and that she had not always been like that; it was something that had developed. (Tr. 78-79). Ms. Thomson testified that Plaintiff had lost two jobs in the past few years over her anger issues. (Tr. 79).

At the supplemental hearing held February 22, 2017, Plaintiff testified that she was caring for her eleven-month-old grandchild a few hours per day a couple days per week, and that she was not being paid to do so. (Tr. 41-43). She testified that she was still substitute teaching one or two days per week, which was kind of rough on her to do both, so she was not

6

substituting as much as she had before. (Tr. 42-43). Plaintiff testified that she was prescribed Topamax and Prednisone for her headaches and back pain, but that her doctors were not planning to do surgery to correct her Chiari malformation unless it got worse. (Tr. 44). Plaintiff also testified that she had a nerve conduction test with abnormal results, but no surgery had been scheduled and she would be re-tested in six months. (Tr. 44).

Plaintiff testified that when she went to see Dr. Honghiran (spelled phonetically in transcript as Hannah Ram) in Russellville, she found the way in blocked, and when she called the office, she was told she had to go around to the back and climb up some stairs. Plaintiff told them she was unable to climb stairs due to her pain and was told if she could not climb the stairs, she would have to reschedule. (Tr. 45-46). Plaintiff testified that she did climb the stairs to go in, and was in pain by the time she got into the office.  (Tr. 46). She testified that Dr. Honghiran stayed less than five minutes with her, and simply had her bend over and touch her toes. (Tr. 46). He then took a phone call, and after he hung up he told her he had to go and ended the appointment. (Tr. 46). Plaintiff testified that she immediately called her lawyer to tell him she had not been examined, as all Dr. Honghiran did was have her walk three feet, bend over to touch her toes, and walk back. (Tr. 46-47). Plaintiff testified that Dr. Honghiran's nurse did take her MRI reports, but she was unsure if he ever looked at them and he never examined her neck where her Chiari malformation was. (Tr. 47).

Plaintiff's boyfriend, James Walls, also testified at this hearing. (Tr. 48). During Mr. Walls' testimony, the ALJ reprimanded Plaintiff for communicating with Mr. Walls and ended his line of questioning. (Tr. 49). The ALJ noted on the record that when he began asking how many days per week they had the grandchild, Plaintiff held up two fingers to the side of the Kleenex box and then while looking at Mr. Walls moved them so he could see them, but the

ALJ saw them before Mr. Walls did. (Tr. 49). The ALJ gave Plaintiff an opportunity to respond and she testified that they sometimes had the granddaughter every day, but that they did not keep her all day but would take her to the babysitter during the day even though they would have her at night. (Tr. 49-50).

A review of the pertinent medical evidence reflects the following. On February 1, 2012, Plaintiff was seen in the Emergency Department by Dr. Timothy Costello for syncope. (Tr. 456). Dr. Costello noted Plaintiff reported a brief syncopal episode when she was working at Dollar Tree that morning, and that she had been hospitalized the year prior with an electrolyte imbalance. (Tr. 457). A physical exam was performed, and no abnormalities were found. (Tr. 458). Dr. Costello found Plaintiff had symptoms consistent with peripheral vertigo and advised her to take meclizine as directed and follow up if her condition did not improve. (Tr. 460). Dr. Costello ordered a CT scan of Plaintiff's brain, which was interpreted by Dr. Robert Brand. (Tr. 467). Dr. Brand found no acute intracranial abnormalities, but suspected mastoiditis on the right. Id.

On January 17, 2013, Plaintiff was seen by Samuel B. Hester, Ph.D., for a Mental Diagnostic Evaluation. (Tr. 404-412). Dr. Hester noted Plaintiff reported having been treated for bipolar disorder in the past but had not had treatment or medications for six months due to lack of resources and was experiencing short frustration tolerance, irritability, sadness, isolation, and loss of motivation. (Tr. 404, 405). Plaintiff reported no childhood trauma, but that she was in an abusive marriage years ago. Id. Plaintiff reported suicidal ideations with no intent but a history of two prior gestures. Id. Dr. Hester noted Plaintiff reported she was in treatment for a single visit with a mental health professional, at which she "states she was told that she was bipolar??" and was prescribed lithium and Seroquel which helped her to be more

stable, but still did not allow her to work. (Tr. 405). Plaintiff reported she had quit many jobs due to feeling stressed and been fired due to not being able to complete tasks efficiently. (Tr. 406). Plaintiff reported difficulty getting along with coworkers and being told she had control issues, and that she had been fired due to anger outbursts. Id. Plaintiff reported she last worked in 2010 and quit to avoid being fired. Id. Dr. Hester noted Plaintiff was appropriately dressed and groomed with good hygiene and no pain indicators noted. (Tr. 406). Dr. Hester observed Plaintiff was cooperative, her mood did not appear to be depressed or anxious, her affect was appropriate, she had no speech abnormalities, her thought process was logical, she did not have any perceptual abnormalities and her thought content was normal except for reported suicidal ideation. (Tr. 406-407). Dr. Hester performed a cognitive exam and opined that Plaintiff did not appear to be functioning within or near the mentally retarded range. (Tr. 408). Dr. Hester opined that Plaintiff appeared to have some male dependency issues. (Tr. 409). Dr. Hester also noted with surprise that Plaintiff had only seen a mental health professional once but was put on Seroquel and lithium and then kept on it for about twelve months by her primary care physician. (Tr. 409). Dr. Hester diagnosed Plaintiff with an unspecified mood disorder, dependent personality traits, and insomnia. (Tr. 409). Dr. Hester opined Plaintiff would have no difficulties in the areas of pace, persistence, communicating in an intelligible manner, and concentration. (Tr. 410-411). Dr. Hester opined that Plaintiff had a limited capacity to communicate and interact in a socially adequate manner, and that while she could cope with the mental demands of work tasks she may do best in an environment that reduces human contact. (Tr. 410).

On October 11, 2013 plaintiff had an in-person assessment at Life Help Mental Health Center. (ECF No. 12, p. 428). Plaintiff had been referred by Dr. Dowell from the Indiana

Family Medical Group and reported she had been sent because she needed to get back on her medication. Id. Her speech was observed to be appropriate but rapid, with appropriate behavior, appearance, mood, affect, thought content, memory, and judgement/insight. (Tr. 428-429). Plaintiff reported she had been prescribed Lexapro and Lithium and that she slept better at night and felt better. (Tr. 428). Plaintiff reported she had no suicidal or homicidal ideations, and no alcohol or drug use. Id. An individual treatment plan was developed for Plaintiff and signed by two staff members whose signatures were illegible. (Tr. 426-427). The form shows Plaintiff's diagnosis as dysthymic disorder, bipolar disorder, and depression which had lasted five years or longer. Id. Plaintiff's long-term goal was that she needed help after having gone off of her medication for a year. Id. Plaintiff's short-term goal was to get her medication and therapy. Id.

On November 7, 2013, Plaintiff was seen at Life Help Mental Health Center for her first follow-up therapy appointment after her emergency intake on October 11, 2013. (Tr. 422). Plaintiff reported she felt she had neglected her health but was back on track. Id. A mental status exam was performed, and the examiner noted Plaintiff appeared disheveled, with agitated motor activity, an anxious affect, rapid and pressured speech, and her attention span was impaired. (Tr. 424-425).

On December 5, 2013, Plaintiff was seen at Life Help Mental Health Center for a follow-up therapy appointment. (Tr. 419). Plaintiff reported fears about an upcoming exploratory surgery for cancer cells in her uterus and concerns about her son and boyfriend. Id. A mental status exam was performed with normal results except for an anxious mood, rapid speech, suicidal and homicidal ideations with plans, and reduced judgement/insight and fund of knowledge. (Tr. 421).

On January 1, 2014, Plaintiff was seen at Life Help for a follow up therapy session. (Tr. 416). Treatment notes show Plaintiff reported her D&C revealed further complications with more medical and possible surgical procedures required with some concern that she may have cervical cancer. Id. Plaintiff reported that her boyfriend had asked her and her son to leave his home and she planned to go back to her parents' home in Arkansas. Id.

On January 8, 2014, Plaintiff was seen at Life Help for depression. (Tr. 417). A mental status exam was performed with normal results, except for reduced judgment/insight and fund of knowledge. (Tr. 418). Plaintiff's medications were listed as lithium and Seroquel. Id.

On February 6, 2014 Plaintiff was seen at Life Help. (Tr. 415). Treatment notes show Plaintiff reported she was concerned about moving back to Arkansas as she had Medicaid/Disability and was worried about services being transferred. Id.

On March 11, 2014, Plaintiff had an initial psychological assessment at Dayspring Behavioral Health. (Tr. 523). Plaintiff's diagnoses were listed as: bipolar I disorder with current episode of depression, an unspecified episodic mood disorder, and restless leg syndrome. (Tr. 530). Plaintiff was observed to be motivated for treatment and it was noted that her prognosis was good with treatment compliance. (Tr. 531). Plaintiff reported her motivation for seeking treatment was not feeling like the same person or mother she used to be, that she could not stand herself most of the time, and that things made her angry most of the time. Id. Plaintiff reported difficulties with depression, sleeplessness, social withdrawal, unresolved grief, anger and verbal aggression. Plaintiff also reported symptoms of post-traumatic stress, including flashbacks, avoidance of people and places, and distressing recollections and dreams. (Tr. 523-524). Plaintiff reported difficulties with grief since March 9, 2011, when she found a

11

friend who intentionally overdosed and died. (Tr. 524). Plaintiff reported the friend's family blamed her for his death and that she blamed herself and pinpointed that day as the start of her mental health issues. Id. Plaintiff reported daily visual hallucinations which sometimes included auditory hallucinations, which she described as people passing by, people hurting others, her grandmother, her friend who died, and people from the past. Id. She reported that they spoke to her sometimes and sometimes they encouraged her to keep going and sometimes they recalled bad things from the past. Id. The examiner noted Plaintiff was cooperative, her speech was clear, her memory and orientation were clear and her intelligence was estimated to be average. (Tr. 524). Her insight/judgment into illness/life situation was described as limited. Id. In Plaintiff's history she reported a history of physical and emotional abuse, specifically that her first husband strangled her, put guns to her head, was controlling and engaged in name calling. (Tr. 528).

On April 3, 2014, Plaintiff was seen by Dr. Chitsey to establish primary physician care. (Tr. 503). Plaintiff reported feeling down, loss of interest, low energy, feeling like a failure, trouble concentrating and having suicidal thoughts. Id. Dr. Chitsey performed a depression screening and found Plaintiff was suffering from severe depression. Id. Dr. Chistsey assessed Plaintiff as suffering from esophageal reflux and bipolar disorder. (Tr. 504). He continued her prescriptions for Seroquel and Lithium for her bipolar disorder and added Ranitidine for esophageal reflux. Id.

On April 22, 2014, Plaintiff was seen by Dr. Chris Taylor for stress urinary incontinence. (Tr. 482). Dr. Taylor noted Plaintiff wished to proceed with surgical intervention.

Id. Dr. Taylor performed a physical examination and noted no abnormal findings. (Tr. 483). Dr. Taylor performed a Burch urethropexy[1]. (Tr. 485).

On April 20, 2014, Plaintiff was seen by Dr. Chitsey and reported she had been doing well after the bladder suspension performed by Dr. Taylor, but had developed nausea and vomiting, a low-grade fever, and diarrhea. (Tr. 487). Dr. Chitsey noted Plaintiff had a white blood cell count of 20,000 and he admitted her for evaluation and treatment. Id. Dr. Chitsey performed a physical examination and noted normal results in all areas except that Plaintiff had dry mucus membranes, her skin had decreased texture and turgor, and that her white blood cell count was 20 but was reduced to 14 the next day. Id. Dr. Chitsey noted Plaintiff was admitted, volume resuscitated, and she was given Zofran for nausea. (Tr. 488). Plaintiff was prescribed Phenegran and a short course of Cipro and instructed to follow up with Dr. Chitsey in one week. Id.

On April 30, 2014, Plaintiff had a CT scan of her abdomen and pelvis. (Tr. 496). The results were read by Dr. Chris Bennett who found: a low midline anterior pelvic wall incision; three centimeter focal density in the right low pelvis positioned anteriorly at the entrance to the right inguinal canal which may reflect a postoperative change or complication at this location and requested clinical correlation; no acute abnormality of the abdomen or pelvis; a small to moderate size hiatal hernia, diffuse fatty infiltration of the liver. Id. Plaintiff was also seen by Dr. Chitsey with complaints of vertigo and vomiting one week after bladder surgery. (Tr. 506). Dr. Chitsey performed a depression screening and Plaintiff reported in the last two weeks she had been bothered by: little interest or pleasure in doing things; feeling down,

---

[1] A Burch procedure is a type of bladder neck suspension that is a modification of the Marshall-Marchetti-Krantz operation for stress incontinence, consisting of fixation of the lateral vaginal fornices to the iliopectineal ligaments. See Dorland's Illustrated Medication Dictionary at 1516, 32nd Edition (2012)

depressed, or hopeless; trouble falling or staying asleep, or sleeping too much; feeling tired or having little energy; poor appetite or overeating; feeling bad about herself or that she was a failure;  and trouble concentrating nearly every day. Id.

On May 5, 2014, Dr. Chitsey called Plaintiff for a two-day hospital follow-up call. Dr. Chitsey's notes show Plaintiff stated she was doing well and was no longer nauseated. (Tr. 510).

On May 20, 2014, Plaintiff had an initial evaluation at Health Resources of Arkansas. (Tr. 534). Plaintiff reported she had three to four episodes of bipolar mania, characterized by going 4-5 days without sleep yet remaining energetic, since her diagnosis of bipolar disorder in 2011 with the most recent occurring in September of 2013. Id. Plaintiff reported she had been off of Seroquel and had experienced auditory hallucinations once or twice a week, but that this did not occur when she was on medication. Id. Plaintiff reported verbal anger outbursts were occurring three to four times a week and that she had been physically aggressive with her daughter three or four weeks ago. Id. Plaintiff reported she did very well on the medications, and things worsened without them. Id.

On August 8, 2014, Plaintiff was seen by Joshua Pursifull, LPC, at Dayspring Behavioral Health. (Tr. 517). Treatment notes show Plaintiff's progress as moderate, that she was compliant with her medication, and her affect, orientation and appearance were normal. Id, Plaintiff's stated goal was to be a better mom and to find something to help her get over her issues and back to enjoying life. (Tr. 521).

On November 8, 2014, Plaintiff was discharged from outpatient treatment at Dayspring Behavioral Health. (Tr. 516). The summary listed Plaintiff's diagnosis as Bipolar I Disorder

with a recent/current/ episode of depression. <u>Id</u>. The outcome of treatment was noted as moderate progress and the reason for discharge was Plaintiff's move to the Fort Smith area. <u>Id.</u>

On December 24, 2014, Plaintiff was seen by Treyce Hunt, APN to establish care. (Tr. 602). Nurse Hunt's notes show Plaintiff reported a history of GERD, bipolar disorder, and PTSD, and she requested a referral to a psychiatrist and to have her lithium levels checked. <u>Id</u>. Dr. Hunt also recorded Plaintiff's complaint of right upper quadrant pain that occurred after eating and was accompanied by nausea, vomiting, and diarrhea. <u>Id</u>. Plaintiff reported it would last for a while and would be relieved by the vomiting or diarrhea and was aggravated by spicy or fried foods and salad. <u>Id</u>.

On December 29, 2014, Plaintiff had an upper abdominal ultrasound. (Tr. 599). The ultrasound was interpreted by Dr. Leo Drolshagen who found fatty liver, and upper normal spleen. <u>Id</u>.

On February 26, 2015, Plaintiff was seen by Corrine Wills, ARNP, for a follow up visit for cough and congestion. (Tr. 589-590). Nurse Wills noted Plaintiff's flu test was negative and advised rest and work release until March 2, 2015. (Tr. 591).

On March 3, 2015, Plaintiff had a chest radiograph which was interpreted by Dr. Laura Moore-Farrell. (Tr. 600). Dr. Moore-Farrell found infiltrate at the left lung base compatible with pneumonia and recommended follow-up chest radiographs to document resolution. <u>Id</u>

15

On March 16, 2015, Plaintiff had a chest radiograph for comparison to an October 25, 2014 study. (Tr. 600). Dr. Adam Gold interpreted the study and found a strand of linear infiltrate in the upper left lobe which he opined was probably atelectasis[2]. (Tr. 600-601).

On May 21, 2015, Plaintiff was seen by Debbie Koch, ANP, at Perspectives Behavioral Health. (Tr. 551). Plaintiff's chief complaint was recorded as having been depressed, with past diagnoses of bipolar disorder, psychotic disorder, and generalized anxiety disorder. Plaintiff reported being physically abused by her parents as a child and an ex-husband when she was twenty years old, as well as emotional abuse from ex-husbands and boyfriends. Id. Plaintiff reported her depression began when she was 25 years old and she experienced low mood, irritability, low self-esteem, hopelessness, difficulty concentrating, tearfulness, isolation, and lethargy. Id. Plaintiff reported her suicidal ideations began around the age of 35 and that she had attempted suicide by overdose in 2013, but that she did not have current intent or plan. Id. Plaintiff reported her manic symptoms began during her early twenties with intense anger, excessive energy, racing thoughts, difficulty concentrating, excessive spending and risk-taking behaviors. (Tr. 552). Plaintiff reported her last manic episode was three to four months ago. Id. Plaintiff reported her anxiety began when she was 22 years old and she had panic attacks without known triggers. ID. Plaintiff reported nightmares that began in her childhood and flashbacks of past abuse, as well as auditory and visual hallucinations that began in her twenties. Id. Plaintiff reported she was taking her medications as prescribed with no side effects and would like to stay on Seroquel and Lithium. Id.

---

[2] Atelectasis is the incomplete expansion of a lung or a portion of a lung or the airlessness or collapse of a lung that had once been expanded. See Dorland's Illustrated Medication Dictionary at 171, 32nd Edition (2012)

On July 15, 2015, Plaintiff was seen by Nurse Koch. (Tr. 616). Nurse Koch performed a mental status examination and found normal results in most areas, except evidence of psychosis noting paranoia. (Tr. 617). Plaintiff reported her mood was up and down with ongoing anxiety and paranoia but denied any suicidal or homicidal ideations. (Tr. 616). Plaintiff reported her last panic attack occurred a couple days ago and lasted for several hours. Id. Plaintiff also reported difficulty concentrating. Id.

On August 10, 2015, Plaintiff was seen by Treyce Hunt, APN, with complaints of dizziness and fainting for the past two weeks with intermittent mid-sternal chest pain starting four days prior. (Tr. 596).

On August 19, 2015, Plaintiff was seen by Robin Sanders, LPC, at Perspectives and a treatment plan was formulated. (Tr. 609). Plaintiff's reported symptoms included: feeling paranoid; overthinking; panicking over schedule changes; high anxiety over bills; seeing people with weapons peeping in her windows and peeking from behind trees; low concentration; low mood and irritability daily; not eating; feeling she had to be in a relationship; not feeling accepted or loved; and crying all the time. (Tr. 610). Plaintiff's diagnosis was listed as bipolar disorder and generalized anxiety disorder. (Tr. 611). Plaintiff's prognosis was noted as good. (Tr. 614).

On November 24, 2015, Plaintiff saw Dr. Mervin Leader at Perspectives for medication management. (TR. 637). Plaintiff reported she was not doing well, feeling depressed, anxious, irritable, unable to function well, having thoughts of suicide and crying spells. Id. Dr. Leader noted Plaintiff's compliance with medication as adequate with no concerns about side effects. Id.

On December 10, 2015, Plaintiff was seen by Janis P. Bishop, CRNP, at Mercy hospital with complaints of burning upon urination and bloody mucous on tissue. (Tr. 648). Plaintiff reported her neck and back pain had improved. Id. Plaintiff's diagnoses were listed as: bilateral low back pain, thoracic back pain, upper respiratory infection, acute bronchitis, right upper quadrant pain, bipolar 1 disorder, post-traumatic stress disorder, dysuria, and urinary retention. (Tr. 656).

On December 17, 2015, Plaintiff was seen by Janis P. Bishop at Mercy Hospital. (Tr. 643) with complaints of sinus pressure, burning on urination, low back pain radiating into both legs, yeast infection, a history of Lyme disease, and that her GERD medications were not working. Id. Nurse Bishop performed a physical examination with normal results except for tenderness upon gentle palpation in lower lumbar spine, slight thoracic curvature, and lumbar radiculopathy that Plaintiff described as an ache staring in her hips and going all the way to the end of her toes. (Tr. 644). Nurse Bishop assessed Plaintiff with hematuria/dysuria, cervicalgia, kidney stone, and advised Plaintiff to go to the emergency room if her symptoms worsened. Id.

On January 18, 2016, Plaintiff was seen by Robin Sanders, LPC at Perspectives. (Tr. 630). Treatment notes show that she reported continuing to do poorly; feeling irritable and worthless with occasional thoughts of suicide but without intention to act upon them. (Tr. 632). Plaintiff reported having to leave work early because she was not able to function well. Id. Plaintiff reported she was unable to hold down a job. Id.

On February 1, 2016, Plaintiff's therapist, Robin Sanders, completed a mental medical source statement. (Tr. 671). She marked fair for each area evaluated under understanding and

memory. Id. In the category of Sustained Concentration and Persistence, Ms. Sanders marked fair for the ability to carry out short detailed instructions and poor or none for all other areas. (Tr. 671-672). In the category of Social Interaction, Ms. Sanders marked fair for the ability to: interact appropriately with the general public, ask simple questions or request assistance, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Tr. 672).

On February 22, 2016, Plaintiff was seen by Mervin N. Leader, MD., at Perspectives for a medication check. (Tr. 683). Dr. Leader noted that since he had last seen Plaintiff, she had discontinued use of Seroquel in favor of an Olazapene/fluoxetine combination and had been prescribed low dose Ambien after calling the clinic on multiple occasions with complaints of insomnia. Id. He noted Plaintiff was doing better in that she was no longer so depressed and anxious and so was no longer so irritable, feeling worthless, and having thoughts of suicide. Id. Dr. Leader also noted she was functioning better and had increased her days at work, but that meant she had less time at home to complete chores, which brought on some anxiety and dysphoria, but overall felt life was wonderful. Id.  Plaintiff reported she was able to tolerate her medications well but was thirsty often and had gained forty pounds in the past year. Id. Dr. Leader noted Plaintiff's speech was pressured and her thought process was distracted. Id. Dr. Leader found Plaintiff's insight and judgement were minimally impaired, but Plaintiff did recognize her need for treatment and care. (Tr. 683). Dr. Leader found Plaintiff had a marked impairment of both attention and concentration. (Tr. 684). Plaintiff's diagnoses were listed as unspecified bipolar and related disorder and generalized anxiety disorder. (Tr. 686).

On April 18, 2016, Plaintiff had an MRI of her cervical spine. (Tr. 675). The MRI  was read by Martin W. Cain, M.D., who gave the impression of a Chiari I malformation with no

obvious syrinx[3] within the cervical cord, and milder central disc bulging at C4-5 and C5-6 levels without canal stenosis. Id.

On June 7, 2016, Plaintiff was seen by Nurse Bishop. (Tr. 739). Plaintiff reported her urologist was checking for possible cancer cells in her urine, and that he had performed bladder irrigations that had helped a great deal. Id. Plaintiff reported she had woken up with right hip pain the last few days. Id. Nurse Bishop examined Plaintiff and found that her lower extremities were asymmetric lengthwise at medial malleolus and knee height, but after isometric exercises their length was almost identical. Id. It was recommended Plaintiff schedule the physical therapy which she had been putting off. Id. Nurse Bishop noted Plaintiff looked much better, with good color, logical and reasonable thinking, staying on task easily and that she was not hyperverbal. Id. Nurse Bishop discussed with the Plaintiff her desire to do some volunteer work at least once a week as she was only working two days a week. Id.

On July 6, 2016, Plaintiff was seen by Janis Bishop, CRNP, to follow-up on her labs, polymyalgia, tremors, and headaches. (Tr. 732). Plaintiff reported that her tremors were worse when her neck hurt, that she continued to go to physical therapy and do the exercises, and that her gastritis/epigastric pain had been well controlled with the use of Tagarnet and pantoprazole. Id.

On July 7, 2016, Plaintiff was seen by Dr. William A Knubley, M.D., to establish care for her Chiari malformation, numbness in her right upper extremity, tremors, and headache. (Tr. 723). Dr. Knubley opined that Plaintiff's chronic migraine headache disorder was possibly

---

[3] Syrinx, in this context, means an abnormal cavity in the spinal cord in syringomyelia. Syringomyelia is a slowly progressive syndrome of cavitation in the central segments of the spinal cord, generally in the cervical region. It results in neurologic deficits, usually segmental atrophy with dissociated sensory loss. See Dorland's Illustrated Medication Dictionary at 1858, 32nd Edition (2012)

due, in part, to medication overuse with a history of chronic migraines since she was a teenager. (Tr. 730). He opined that Plaintiff's Arnold-Chiari malformation type I without syrinx was likely asymptomatic. Id. Dr. Knubley opined that Plaintiff's history of idiopathic right optic neuritis was possibly due to Plaintiff's use of Zoloft, but noted there were no recurrent episodes which would suggest neuromyelitis optica or multiple sclerosis. Id. Dr. Knubley found that Plaintiff had symptoms suggestive of sleep apnea, and that her essential tremor was possibly aggravated by sleep apnea and prediabetes. Id. He noted her possible family history, and medication use put her at risk of Parkinson disease, but that there was no clear evidence of parkinsonism. Id. Dr. Knubley noted carpal tunnel syndrome symptoms on Plaintiff's right hand with changes suggestive of neuropathy in her feet. Id. Dr. Knubley recommended: a sleep study to check for sleep apnea; an MRI to check for multiple sclerosis or changes coming from her Arnold-Chiari malformation; a trial of Topamax and Imitrex for her headaches and tremors; and an EMG to check for carpal tunnel syndrome. (Tr. 730).

On July 28, 2016, Plaintiff had a nerve conduction study performed by Dr. Knubley on her upper and lower extremities. (Tr. 745). Dr. Knubley found Plaintiff had carpal tunnel syndrome and ulnar motor neuropathy on the right, sensory neuropathy of the upper extremities, and possible right tibial neuropathy. Id.

On August 9, 2016, Plaintiff was seen by Nurse Bishop and reported she was pleased with her visit with Dr. Knubley and appreciated the fact that he was watching her neurological conditions and mentioned she could be in the early stages of multiple sclerosis and that he would follow up with her in three months. (Tr. 766). Nurse Bishop noted Plaintiff was not interested in any type of surgery at that time because her symptoms were intermittent paresthesia, and Nurse Bishop planned to give her a prescription for a wrist splint to wear on

her right side as needed. Id. Nurse Bishop noted Plaintiff was in very good spirits and brought her four-month-old granddaughter with her today and stated she had been keeping her for the past two weeks and was going to assist with babysitting. Id. Plaintiff also reported she would like to work a couple of days per week, and Nurse Bishop opined that Plaintiff's stress level seemed to be well balanced and it would be excellent for Plaintiff to stay busy with things she enjoyed. Id.

On August 29, 2016, Plaintiff was seen by Ted Honghiran, M.D., for a consultative examination. (Tr. 751). Plaintiff reported she had been involved in an auto accident a long time ago, but that the pain in her neck had been getting worse over the last four to five years, so her family doctor referred her to a neurologist. (Tr. 751). Plaintiff reported an MRI scan was done which showed evidence of a bulging disk at C4-C5 and C5-C6, as well as a Chiari malformation which nothing had been done about. Id. Plaintiff reported she had been taking muscle relaxants and the pain medication oxycodone. Id. Plaintiff reported she had borderline diabetes but was not on any medications, and that she did not smoke or drink. Id. Dr. Honghiran performed a physical examination and found Plaintiff walked normally without a cane or crutches, was able to dress and undress herself, and was able to get on and off of the examination table unassisted. (Tr. 752). Dr. Honghiran's examination of Plaintiff's cervical spine showed complete range of motion with no muscle spasms or pain on range of motion, as well as normal reflex and sensation in both arms and hands. Id. Dr. Honghiran also examined Plaintiff's low back and found complete range of motion with no muscle spasm, no pain on range of motion, negative straight leg raises on both sides, and normal reflex and sensation. Id. Dr. Honghiran reviewed Plaintiff's previous reports and found the MRI of her cervical spine showed evidence of a bulging disk at C4-C5 and C5-C6, as well as Chiari's malformation. Id.

22

Dr. Honghiran opined that Plaintiff's prognosis was good, and that while her pain would be a chronic problem, she should try to go back to school to get some more education so that she could continue to work.  Id.  He also recommended that she follow up with the neurologist or neurosurgeon in regards to her Chiari's malformation. Id.

On January 12, 2017, Plaintiff saw Justin Clayton, M.D., for left foot pain. (Tr. 773). She reported that she had a table fall on her foot at school in mid-November and thought it would get better, and it had not changed her ability to walk without assistive devices, but she continued to have pain. Id. Dr. Clayton performed a physical examination and found no edema or ecchymosis in Plaintiff's left foot. Id.  He observed that she had good balance when she stood and could ambulate in regular shoe wear without antalgic gait. Id. Dr. Clayton found she had good sensation but mild tenderness which was exacerbated by resisted eversion[4] of the foot. Id. Dr. Clayton diagnosed Plaintiff with peroneal tendonitis on the left, and opined that this was likely due to her compensatory gait pattern and advised her to wear a stiff sole with a soft insert and perform some physical therapy exercises. (Tr. 774-775).

On January 1, 2017, Plaintiff was seen by Dr. Knubley and reported her migraines were better with the use of Topamax. (Tr. 779-780). Dr. Knubley noted Plaintiff's workup for neuromyelitis optica and multiple sclerosis was negative, and that her tremor, which was gradually worsening, may be due to sleep apnea. (Tr. 780). Dr. Knubley found Plaintiff's Chiari malformation without syrinx looked about the same and, since Plaintiff was doing better with Topamax for her headaches but was having more problems with tremors, he decided to prescribe low-dose Mysoline and adjust accordingly after Plaintiff's sleep evaluation. (Tr.

---

[4] Eversion here means turning outward, as of the sole of the foot. See Dorland's Illustrated Medication Dictionary at 655, 32nd Edition (2012)

780). Dr. Knubley offered his impression as: chronic migraine headache disorder improved on medication; Arnold-Chiari malformation type 1 asymptomatic; isolated episode of idiopathic right optic neuritis, possibly medication induced; sleep disordered breathing to be further evaluated; essential tremor worse; carpal tunnel syndrome in the right hand; and bipolar disorder type 1, stable. (Tr. 781).

On April 12, 2017, Nurse Bishop provided a letter restricting Plaintiff's lifting to nothing over 10 pounds based upon Plaintiff's diagnosis of cervical and lumbar degenerative disc disease and in particular her Chiari 1 malformation. (Tr. 817). Nurse Bishop wrote that this medical need would be lifelong. Id.

## III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance, but is enough that a reasonable mind could accept as adequate to support a conclusion. Ponder v. Colvin, 770 F.3d 1190, 1193-94 (8th Cir. 2014). The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F.3d 964,966 (8th Cir. 2003). So long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F. 3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

24

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted for at least one year and that prevents him from engaging in substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§ 423 (d)(3), 1382(3)(C).

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. See 20 C.F.R. § 404.1520. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R § 404.1520. While the burden of production shifts to the Commissioner at step five, the burden of persuasion to prove disability and to demonstrate RFC both remain on the claimant. Stormo v. Barnhart, 377 F. 3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five").

## IV.    Discussion

Plaintiff raises the following issues in this matter: 1) Whether the ALJ failed to properly develop the record; 2) Whether the ALJ erred in evaluating Plaintiff's impairments; and 3) Whether the ALJ erred in his residual functional capacity (RFC) finding.

### A.        ALJ's Development of the Record:

Plaintiff argues that the ALJ rejected the medical evidence provided by Plaintiff's two treating and examining sources, and therefore did not have sufficient evidence to address her specific functional limitations. (Doc. 16, p. 4).

The ALJ has a duty to fully and fairly develop the record. See Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir.1995). The ALJ's duty to fully and fairly develop the record is independent of Plaintiff's burden to press his case. Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir.2010). However, the ALJ is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably complete record and reversal on these grounds requires that the failure to develop the record was unfair or prejudicial. Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995), McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011).  The duty to develop the record extends only to ordering additional medical examinations and tests if the medical records presented do not provide enough information to determine whether the claimant is disabled. Conley v. Bowen, 781 F.2d 143, 146 (8th Cir. 1986).

In this case, the ALJ sent Plaintiff for a consultative examination with Dr. Hester, assigned substantial weight to Dr. Hester's opinions and incorporated his recommendations that Plaintiff may do best in an environment that reduced human contact in the limitations specified in his RFC. (Tr. 25). The ALJ afforded no weight to the opinion of the second examining physician, Dr. Honghiran, due to Plaintiff's objections concerning the level of thoroughness of the examination. (Tr. 25).

The ALJ also afforded substantial weight to the physical and mental assessments made by non-examining state medical consultants. (Tr. 25). On September 18, 2015, state agency

medical consultant Bill Payne, M.D., reviewed Plaintiff's medical record and found that "the claimant's described functional limitations are not credible" and found that her physical impairments were not severe. (Tr. 108). On November 13, 2015, state agency medical consultant Alice Davidson, M.D., reviewed Plaintiff's record and, after noting there were no new allegations or medical evidence of record, affirmed the rating of non-severe. (Tr. 127). On September 23, 2015, state agency medical consultant Kevin Santulli, Ph.D., reviewed Plaintiff's case and found that her mental status was unremarkable, noting that she cared for a child, had no problems with personal care, prepared meals, drove alone, shopped, paid bills, socialized daily, and had some problems with getting along with authority and attention. (Tr. 113).   Dr. Santulli opined that Plaintiff retained the ability to perform work where: interpersonal contact was incidental to work performed; tasks were learned and performed by rote with few variables and little judgement required; and supervision was simple, direct, and concrete. Id. Dr. Santulli gave Plaintiff an overall rating of the ability to do unskilled work. Id. On November 13, 2015, state agency medical consultant Dan Donahue, Ph.D., reviewed Plaintiff's records and also opined that Plaintiff had some problems with authority and attention and could perform unskilled work. (Tr. 131).

The record also contained three years of treatment records which included radiology reports, results of medical tests, and opinion evidence. (Tr. 405-820). The ALJ considered the medical evidence of record indicating that Plaintiff's conditions had improved with treatment. (Tr. 24).  The ALJ considered Plaintiff's reports that her mental health treatment had reduced her symptoms in January of 2013, May of 2014, and April of 2016. (Tr. 24). In April of 2016, Plaintiff reported she was no longer as depressed or anxious and no longer experienced chest pain, nausea, irritability, feelings of worthlessness, or thoughts of suicide. (Tr. 24, 678).

Plaintiff reported that she felt so much better that she had increased the number of days she was working. Id.

The ALJ also considered the objective medical evidence in the form of X-rays and MRI's in the record. The ALJ noted that Plaintiff's X-rays of her lumbar spine from November of 2015 showed only minor chronic degenerative changes and were interpreted to reveal negative results. (Tr. 23). The ALJ considered an MRI of Plaintiff's lumbar spine performed in April of 2017, which also found mild degenerative changes and some mild left facet hypertrophy and lateral recess narrowing. Id. The ALJ also considered an MRI of Plaintiff's cervical spine from April of 2016, which showed evidence of Chiari malformation, and characterized it as a grade one mild malformation. Id.

The ALJ considered Plaintiff's testimony at two hearings nearly a year apart, and her disability reports. (Tr. 38, 52). The ALJ considered Plaintiff's reports that she was able to attend to her own personal hygiene unassisted, care for her teenage son and infant granddaughter, assist in the care of family pets, perform general household tasks, drive a vehicle, shop, manage her financial affairs, and work as a substitute teacher on a part-time basis. (Tr. 24, 41-43, 49-50, 329-333).

The ALJ also considered the testimony given by Plaintiff's mother and boyfriend, and considered them as non-medical source evidence. (Tr. 26). He noted the significance of their lengthy relationships and familiarity with Plaintiff, but afforded their opinions less weight than those offered by medical sources. Id.

The ALJ also noted that the GAF scores were considered but were afforded little weight as they were a subjective scale, as acknowledged by the DSM-IV. (TR. 26).

28

Therefore, the Court finds Plaintiff's argument on this issue is without merit.

**B.      Plaintiff's Impairments:**

Plaintiff argues that the ALJ erred at step two by failing to consider her carpel tunnel syndrome in her right arm with sensory neuropathy and ulnar motor neuropathy; migraine headaches; chronic neck, back, and hip pain; as well as chronic incontinence of urine, nocturia, urinary bladder disorder and dysuria, all relating to a bladder suspension she underwent in 2014, with progressively worsening symptoms relating to the same to be severe.  (Doc. 16, p. 2).  Plaintiff does not cite to any specific medical records or assessments in making this assertion, but rather states "[t]hese diagnosis' and related findings are replete throughout her medical records." (Doc. 16, p. 2).

At Step Two of the sequential analysis, the ALJ is required to determine whether a claimant's impairments are severe. <u>See</u> 20 C.F.R. §404.1520(c). While "severity is not an onerous requirement for the claimant to meet… it is also not a toothless standard." <u>Wright v. Colvin</u>, 789 F.3d 847, 855 (8th Cir. 2015) (citations omitted). To be severe, an impairment only needs to have more than a minimal impact on a claimant's ability to perform work-related activities. <u>See</u> Social Security Ruling 96-3p. The claimant has the burden of proof of showing she suffers from a medically severe impairment at Step Two. <u>See</u> <u>Mittlestedt V. Apfel</u>, 204 F.3d 847, 852 (8th Cir. 2000).

The ALJ carefully considered Plaintiff's treatment records and the results of her consultative examinations in determining which of her impairments were severe.  (Tr. 18-20). The ALJ considered the July 2016 nerve conduction study that was abnormal and consistent with carpal tunnel syndrome on the right, however he also noted Plaintiff did not seek treatment until 2016, roughly four years after her alleged onset of disability.  (Tr. 18-19, 778-779). The

ALJ also noted that Plaintiff reported to nurse practitioner Janis Bishop in August 2016 that she was not interested in any type of surgery to treat this condition because her symptoms were intermittent. (Tr. 18-19, 766). Plaintiff testified at the February 22, 2017, hearing that with respect to ulnar neuropathy and carpal tunnel on the right, she was going to be retested in about six months to a year (Tr. 44).

The ALJ considered Plaintiff's complaints of chronic neck, back and hip pain. (Tr. 19). He first noted that the record reflected she rarely sought treatment for her pain. (Tr. 19). The ALJ also noted that the x-ray evidence revealed relatively unremarkable results, and that Dr. Knubley recommended relatively conservative treatment in the form of physical therapy for Plaintiff's pain. Id. The ALJ specifically noted that an April 2016 cervical spine MRI revealed a "milder" central disc bulging at C4-5 and C-5-6, without canal stenosis; and a Chiari I malformation. (Tr. 23, 675, 694). The ALJ noted that a grade I Chiari Malformation is characterized as mild (Tr. 23). Treating physician William A. Knubley, M.D., opined on July 7, 2016, that the Arnold-Chiari malformation type I without syrinx was likely asymptomatic. (Tr. 730). A brain MRI was obtained on July 21, 2016 (Tr. 782-783). Dr. Knubley recorded in treatments notes from January 2017 that Plaintiff's migraine headaches had improved with medication. (Tr. 781).

The ALJ considered Plaintiff's complaints concerning her bladder, incontinence, and dysuria, and considered that Plaintiff failed to pursue the additional testing that was recommended in April of 2016. (Tr. 19). The ALJ found that given Plaintiff's demonstrated work ability and her failure to pursue additional treatment, there was not sufficient evidence to support a finding that this condition caused more than a minimal limitation. Id.

The ALJ considered Plaintiff's daily activities, including her continued work as a substitute teacher two days a week, and her ability to tend to her infant granddaughter for at least two days per week and perhaps more, as the actual amount of time she watched her granddaughter was not totally clear. (Tr. 17-18, 41, 49-50, 304-305). The ALJ found that Plaintiff's performance of work-related activities did not support a finding that her pain, bladder issues, or carpal tunnel syndrome were severe. (Tr. 19).

While the ALJ did not find all of Plaintiff's alleged impairments to be severe impairments, the ALJ specifically discussed the alleged impairments and clearly stated that he considered all of Plaintiff's impairments, including the impairments that were found to be non-severe. See Swartz v. Barnhart, 188 F. App'x 361, 368 (6th Cir. 2006) (where ALJ finds at least one "severe" impairment and proceeds to assess claimant's RFC based on all alleged impairments, any error in failing to identify particular impairments as "severe" at step two is harmless); see also 20 C.F.R. §416.945(a)(2) (in assessing RFC, ALJ must consider "all of [a claimant's] medically determinable impairments"); §416.923 (ALJ must "consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity").

The Court finds the ALJ did not commit reversible error in setting forth Plaintiff's severe impairments during the relevant time period.

### C.    ALJ's RFC Determination:

Plaintiff argues the ALJ erred in his RFC determination by failing to consider the side effects of the medications she was prescribed. (Doc. 16, p. 2). Plaintiff argues that consultative examiner Dr. Honghiran's report was "wishy washy at best" but also notes Dr. Honghiran found pain would be a chronic issue, recommended Plaintiff return to school, and that she

follow up with a neurologist and neurosurgeon. Id. Plaintiff also objected to the ALJ's assignment of little weight to the opinions of Robin Sanders and Janice Bishop as they had a long history of treating Plaintiff. (Doc. 16, p. 3).

RFC is defined as the most that a person can do despite that person's limitations. 20 C.F.R. §404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. Guilliams v. Barhart, 393 F. 3d 798, 801 (8th Cir. 2005). Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations from symptoms such as pain are also factored into the assessment. 20 C.F.R. §404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

With respect to weight given to the opinions of treating physicians, "[a] claimant's treating physician's opinion will generally be given controlling weight, but it must be supported by medically acceptable clinical and diagnostic techniques, and must be consistent with other substantial evidence in the record." Andrews v. Colvin, No. 14-3012, 2015 WL 4032122 at *3 (8th Cir. July 2, 2015) citing Cline v. Colvin, 771 F.3d 1098, 1102 (8th Cir. 2014). "A treating physician's opinion may be discounted or entirely disregarded 'where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such

opinions.'" Id. "In either case - whether granting a treating physician's opinion substantial or little weight - the Commissioner or the ALJ must give good reasons for the weight apportioned." Id.

The ALJ first considered the medical evidence, noting that the objective medical evidence in the record revealed generally unremarkable findings. (Tr. 23). He specifically discussed X-rays of Plaintiffs thoracic and lumbar spine from November 2015, an MRI of Plaintiff's lumbar spine from April 2016, X-rays of Plaintiff's cervical spine from December 2015, and an MRI of Plaintiff's cervical spine from April 2016. Id. The ALJ also considered evidence in the record indicating that Plaintiff improved with treatment, including her reports of doing better with medication and being able to increase the number of days she was working. (Tr. 24). The ALJ considered evidence in the record showing Plaintiff failed to follow treatment recommendations of her treating physician and that she sought treatment on a sporadic basis, including her report on October 23, 2013, that she had been off her medications for one year. Id The ALJ also considered Plaintiff's work activity since the alleged onset date, specifically her work two days per week as a substitute teacher and her babysitting her infant granddaughter two days per week. (Tr. 25).

The ALJ afforded substantial weight to the opinion of consultative examiner Dr. Hester, as he personally evaluated the plaintiff, rendered his opinions within his area of professional expertise, and made conclusions that were generally consistent with the record. (Tr. 25). The ALJ noted Dr. Hester's opinion that Plaintiff may do best in an environment that reduced human contact and incorporated that recommendation into his RFC determination by limiting claimant to work where interpersonal contact was limited to the work performed. Id.

As discussed above, the ALJ considered the physical and mental assessments offered by the non-examining medical consultants and afforded each of them substantial weight. (Tr. 25).

The ALJ considered the opinion of Robin Sanders, LPC, and afforded those opinions little weight as they were inconsistent with the claimant's demonstrated work history as she had maintained employment for an extended period of time as a substitute teacher, in an environment which required the ability to work in coordination with or proximity to others. (Tr. 25, 672). The ALJ also considered the opinions of Nurse Bishop and afforded her opinions little weight as they were not supported by objective medical evidence and were inconsistent with Plaintiff's stated abilities. (Tr. 25).

Based on the record as a whole, the Court finds substantial evidence to support the ALJ's RFC determination.

## V.      Conclusion

Accordingly, the undersigned recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. §636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 29th day of January 2019.

/s/   *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE